IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

MICHELLE LYNN HOPPE,

    Plaintiff,

        v.                 CIVIL NO.: WDQ-10-1320

COLLEGE OF NOTRE DAME OF
MARYLAND,

    Defendant.

\* \* \* \* \* \* \* \* \* \* \* \* \*

MEMORANDUM OPINION

Michelle Lynn Hoppe sued the College of Notre Dame of Maryland (the "College") under Title III of the Americans with Disabilities Act of 1990 (the "ADA")[1] and Section 504 of the Rehabilitation Act of 1973.[2] For the following reasons, the College's motion for summary judgment will be granted.

I.    Background[3]

Hoppe, who has attention deficit disorder, has trouble concentrating and remembering information.[4] In 1993, at age 17, she began her 13-year relationship with the College. Compl. ¶ 1. The

---

[1] 42 U.S.C. §§ 12181 et seq.

[2] 29 U.S.C. § 794.

[3] In reviewing the motion for summary judgment, Hoppe's evidence "is to be believed, and all justifiable inferences are to be drawn in [her] favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

[4] See Compl. ¶ 3; ECF No. 14, Ex. 15 at 1.

College knew about her learning disability. *See id.* ¶ 3. Sister Sharon Slear, Ph.D., the College's Dean of Education, was Hoppe's advisor. *Id.* ¶ 8; Sister Slear Aff. ¶¶ 2-3.

In 1997, Hoppe earned a Bachelor of Arts in Psychology. Compl. ¶ 1. In 2001, she completed a Master of Arts in Leadership in Teaching, with concentrations in Administration and Special Education. *Id.* ¶¶ 1-2. In 2004, Hoppe earned a Masters Plus Thirty Certificate of Advanced Studies in Education. *Id.* ¶ 2.

In 2004, Hoppe and 18 other students entered the College's Instructional Leadership for Changing Populations Ph.D. program (the "Ph.D. Program"). Sister Slear Aff. ¶¶ 5, 14. Among other program requirements, a Ph.D. candidate must pass six comprehensive essay exams. *Id.* ¶ 6; ECF No. 14, Ex. 5 [hereinafter Ph.D. Program Reqs.] at 1. Typically, the candidate must complete the six exams in two three-hour sessions on one day, allocating one hour per essay. ECF No. 14 at 4.

The Ph.D. Program follows a "Two-Time Fail Rule." Sister Slear Aff. ¶ 6; Ph.D. Program Reqs. 1. A candidate who fails one of the six exams may retake it. *Id.* If she fails again, she will be dismissed from the program. *Id.*

Before adopting the Two-Time Fail Rule, the College's Ph.D. implementation committee considered the "One-Time Fail Rule" used by other educational institutions. Sister Slear Aff. ¶ 6. After "careful consideration and discussion," the committee

ultimately chose the Two-Time Fail Rule because it affords each candidate a "reasonable and better opportunity" to demonstrate her knowledge, critical thinking, and writing and application skills. *Id.* Sister Slear advised all candidates of the Two-Time Fail Rule. *Id.* ¶ 7; *see, e.g.,* Lawson Aff. ¶ 4.

During the coursework for the Ph.D. Program, Hoppe was provided other students' class notes, extra time to complete exams, and extended deadlines on certain assignments. Sister Slear Aff. ¶ 8; ECF No. 14, Ex. 8 at 1.

In May 2006, Hoppe paid tuition for her summer and fall 2006 courses. Franklin Aff. ¶¶ 3-5. She made no further payments. *Id.* ¶ 5. In September 2006, Hoppe began her last course at the College. *Id.*

On October 2, 2006, Hoppe contacted Irene C. Ferguson, Ed.D.,[5] about that month's upcoming six comprehensive exams. ECF No. 14, Ex. 9 at 1-2. Hoppe expressed concern that her learning disability would hinder her performance. *See id.* On October 10, 2006, Dr. Ferguson e-mailed Hoppe a list of "accommodations" for the exams. *Id.* at 1. Hoppe was to be provided, *inter alia*:

(1) two days instead of one to take the six exams;
(2) an hour-and-a-half instead of one hour per exam; and
(3) a "solitary environment."

*Id.*

---

[5] The College's Vice President for Student Development and designated Coordinator for Disabled Student Services. ECF No. 14 at 6; ECF No. 14, Ex. 9 at 2.

3

From discussions with Hoppe, the College anticipated that she would take three exams each on October 14 and 15, 2006. Sister Slear Aff. ¶ 10.

Sometime before October 14, 2006, Sylvia Lawson, another Ph.D. Program candidate, requested permission from the College to handwrite her exams because of her poor typing skills. *Id.* ¶ 9; Lawson Aff. ¶ 5.

On October 14, 2006, Hoppe sat in a computer lab for the first day of her exams. Sister Slear Aff. ¶ 9. To accommodate Lawson and ensure the ability to proctor all the candidates, Sister Slear allowed Lawson to handwrite her exams at a desk in the computer lab. Lawson Aff. ¶ 5; Sister Slear Aff. ¶ 9. Only Hoppe and Lawson were in the room. *See* ECF No. 17 at 4.

The computer lab is larger than a typical classroom, including the room where the other 17 Ph.D. Program candidates were testing. Lawson Aff. ¶ 5; Sister Slear Aff. ¶ 9. A large chalkboard was placed in the middle of the computer lab, as a partition between Hoppe and Lawson. *Id.* With her back toward the chalkboard, Lawson handwrote her exams at a desk facing a wall. *Id.* Lawson and Hoppe had no physical, verbal, or eye contact during the exams. Lawson Aff. ¶ 5. Hoppe asserts that "the noise generated by [Lawson] severely hindered [her] ability to complete the

4

examinations."[6]

That day, Hoppe chose to complete four exams instead of three. Slear Aff. ¶ 10. After the exams, Hoppe "expressed her appreciation for [the] accommodations" to Sister Slear. Id.

On October 15, 2006, Hoppe took the remaining two exams in a room by herself. Id. ¶ 9.

In October or November 2006, Hoppe learned that she had failed three of the four October 14, 2006 exams, and passed both October 15, 2006 exams. See Compl. ¶ 4; ECF No. 14, Ex. 10 at 1. In November 2006, Hoppe asked to review her unsatisfactory answers and retake the three failed exams. Id. Although Hoppe was not allowed to re-read her exams,[7] Sister Slear reviewed Hoppe's answers with her, consulted Hoppe's professors, provided feedback, and suggested review strategies. ECF No. 14, Ex. 11 at 1; see also ECF No. 14, Ex. 10 at 1. Hoppe was also told that she could retake the three exams with the same accommodations as before, and that this would be her "final opportunity . . . to re-write [her] answers." Id. at 1-2.

On January 5, 2007, Hoppe requested more accommodations for the upcoming three retakes. See ECF No. 14, Ex. 11 at 1-2. She sought to retake each exam on a different day, and in "open

---

[6] ECF No. 17 at 4 (Hoppe's opposition to the College's motion for summary judgment). Hoppe did not allege this in her complaint.

[7] In accordance with the College's policy. Ph.D. Program Reqs. 1.

5

book" format. *Id.* Hoppe also requested to retake each exam twice (for a total of three times each) because Lawson had been in the computer lab on October 14, 2006. *Id.* at 1.

On January 25, 2007, Dr. Franklin informed Hoppe that she could retake each exam on a different day. *Id.* However, she explained that Hoppe could not retake the exams open book because such a format would "fundamentally alter [the Ph.D. Program's] standards and testing requirements." *Id.* at 2.[8] In light of the Two-Time Fail Rule, Dr. Franklin also denied Hoppe's request to retake each exam twice. *See id.* at 1. Dr. Franklin added that Hoppe had not previously raised the issue of Lawson's presence, and noted her "surprise" that Hoppe had only now complained about it. *Id.*

In February and March 2007, Hoppe continued to discuss exam accommodations with the College. *See* ECF No. 14, Ex. 12 at 1. On March 6, 2007, the College decided that Hoppe could retake the exams open book, and explained that she would be able to access the relevant books or articles during the exams. *Id.* The College also arranged two possible testing schedules to accommodate Hoppe's preference for Sundays. *Id.*

---

[8] Dr. Franklin explained that the exams were intended to assess a candidate's "comprehensive working professional knowledge of the field" and "ability to synthesize this knowledge in order to satisfactorily respond to the questions without references." ECF No. 14, Ex. 11 at 2.

On March 18 and April 1 and 15, 2007, in accordance with her preferred schedule, Hoppe retook the three failed exams in a room by herself. Sister Slear Aff. ¶ 12.

As required by the College's grading practices, each of Hoppe's retakes was evaluated and graded by at least two faculty readers, and one was read by four. *Id.* ¶ 13. None of the readers gave any of the retakes a passing grade. *Id.*[9] On May 24, 2007, Hoppe was dismissed from the Ph.D. Program. ECF No. 14, Ex. 13.[10]

In June 2007, upon Hoppe's request, the Ph.D. faculty committee undertook a "detailed and careful review" of Hoppe's dismissal. ECF No. 14, Ex. 14 at 1. On June 14, 2007, the committee concluded that Hoppe had been appropriately accommodated during her exams, and noted that permission to retake the exams open book was "an extraordinary accommodation, beyond one that could normally be expected for comprehensive examinations." *Id.* Noting the Two-Time Fail Rule, the committee declared its dismissal decision final. *Id.*[11]

---

[9] Although Hoppe retook the exams open book, the faculty readers determined that she had not provided "analysis or application," and her answers "did not demonstrate that she had been able to synthesize and evaluate the information." Sister Slear Aff. ¶ 13.

[10] Three other candidates who failed twice were also terminated from the Ph.D. Program under the Two-Time Fail Rule. Sister Slear Aff. ¶ 14.

[11] That day, Sister Slear congratulated Hoppe on the degrees she had earned at the College, and "wish[ed Hoppe] much success in

In March 2008, Hoppe underwent a psycho-educational evaluation at the Kennedy Krieger Institute in Baltimore. *See generally* ECF No. 14, Ex. 15.[12] The evaluators noted that if the Ph.D. Program were to reinstate Hoppe, appropriate accommodations would include extra time on and breaks between exams, and testing in a "quiet/solitary environment." *Id.* at 8.

On May 24, 2010, Hoppe sued the College under Title III of the ADA and Section 504 of the Rehabilitation Act for failing to provide reasonable accommodations (Count One) and breach of contract (Count Two). *See* Compl. ¶¶ 14-16.[13] On December 10, 2010, the College moved for summary judgment. ECF No. 14. On January 24, 2011, Hoppe opposed that motion. ECF No. 17. On February 17, 2011, the College filed its reply. ECF No. 18.

---

whatever work [she would] undertake in the future." ECF No. 14, Ex. 14 at 2; *see* discussion *supra* p. 2.

[12] Thomas H. Ley, Ph.D. and Marjorie A. Fessler, Ed.D. performed the evaluation. ECF No. 14, Ex. 15 at 1.

[13] Initially, Hoppe also alleged that the College violated the ADA by failing to inform her about the Ph.D. Program's requirements (Count Three). Compl. ¶¶ 17-18. However, Hoppe now "does not dispute [the College's argument that] there is no duty under the ADA to inform students of program requirements before [they] enter[] the program." ECF No. 17 at 1. Thus, summary judgment will be granted to the College on Count Three.

II. Analysis

A. Standard of Review

Under Rule 56(a), summary judgment "shall [be] grant[ed] . . . if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[14] In considering the motion, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The Court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in h[er] favor," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the Court must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial," *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (citation and internal quotation marks omitted).

---

[14] Rule 56(a), which "carries forward the summary-judgment standard expressed in former subdivision (c)," changed "genuine 'issue' [to] genuine 'dispute,'" and restored the word "'shall' . . . to express the direction to grant summary judgment." Fed. R. Civ. P. 56 advisory committee's note.

B. The College's Motion for Summary Judgment

1. Count One: Failure to Provide Reasonable Accommodations

a. The Parties' Arguments

Hoppe asserts that the College violated the ADA and the Rehabilitation Act by failing to reasonably accommodate her during the October 14, 2006 exams--specifically, she was not provided a solitary testing environment because Lawson was also in the computer lab. See Compl. ¶¶ 4, 15.[15] Hoppe asserts that the "noise generated by [Lawson] severely hindered [her] ability to complete the examinations." ECF No. 17 at 4. Hoppe argues that because she was not reasonably accommodated on October 14, 2006, she should have been given a third opportunity to pass the exams. See id. at 4.

In moving for summary judgment, the College argues that: Hoppe was reasonably accommodated, and she was not "otherwise qualified" to remain in the Ph.D. Program despite the accommodations; and providing a third opportunity to pass the exams would fundamentally alter the nature of the Ph.D. Program. ECF No. 14 at 15, 23.[16]

---

[15] Hoppe concedes that she was given a solitary testing environment on October 15, 2006 (last two of the six initial exams) and March 18 and April 1 and 15, 2007 (retakes of the three failed exams). See ECF No. 17 at 4-5.

[16] The College also asserts that Hoppe's claims are time-barred. ECF No. 14 at 27. As will be discussed in Part II.B.1.c-d and 2, this argument need not be addressed.

10

b. The Disability Statutes

Title III of the ADA and Section 504 of the Rehabilitation Act protect learning-disabled students from discrimination by educational institutions. *See, e.g., Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1076 (8th Cir. 2006). Title III of the ADA prohibits the owner of a place of public accommodation from discriminating against an individual "on the basis of disability." 42 U.S.C. § 12182(a).[17] Discrimination includes failing to make "reasonable modifications in policies, practices, or procedures" to accommodate disabled individuals, unless the modifications would "fundamentally alter the nature" of the services. 42 U.S.C. § 12182(b)(2)(A)(ii). Section 504 of the Rehabilitation Act prohibits a federally-funded program from discriminating against an "otherwise qualified individual with a disability" because of her disability. 29 U.S.C. § 794(a).[18]

The ADA and the Rehabilitation Act "generally are construed to impose the same requirements." *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 468 (4th Cir. 1999). Although Title III of the ADA does not expressly include the Rehabilitation Act's "otherwise

---

[17] The College does not dispute that it is a place of public accommodation. *See* ECF No. 14 at 13-15; 42 U.S.C. § 12181(7)(J) (a private college or university is a place of public accommodation under the ADA).

[18] The College does not dispute that it receives federal funds. *See* ECF No. 14 at 13-15.

qualified" standard,[19] courts analyze Title III claims against educational institutions under that standard.[20]

Thus, in the higher education context, a plaintiff alleging failure to accommodate under Title III of the ADA or Section 504 of the Rehabilitation Act must establish that she: (1) is disabled;[21] (2) is "otherwise qualified" academically; and (3) requested a reasonable accommodation that would not fundamentally alter the nature of the defendant's service. See Mershon, 442 F.3d at 1076; Kaltenberger, 162 F.3d at 435-36.

    c. The College's Accommodations and Whether Hoppe Was "Otherwise Qualified"

A student with a learning disability is "otherwise qualified" academically if she can meet her school's educational requirements

---

[19] This is because usually, "no qualifications are required to enjoy a public accommodation as secured by Title III." Mershon, 442 F.3d at 1076.

[20] See, e.g., Mershon, 442 F.3d at 1076 (in the post-secondary education context, the "otherwise qualified" standard is "implicit in Title III" of the ADA); Kaltenberger v. Ohio Coll. of Podiatric Med., 162 F.3d 432, 433-37 (6th Cir. 1998) (discussing whether learning-disabled student was "otherwise qualified" under Title III of the ADA); Bercovitch v. Baldwin Sch., Inc., 133 F.3d 141, 152-55 (1st Cir. 1998) (same); Forbes v. St. Thomas Univ., Inc., --- F. Supp. 2d ----, 2010 WL 6755458, at *4-*10 & n.4 (S.D. Fla. Sept. 30, 2010) (same); cf. Betts v. Rector & Visitors of Univ. of Va., 145 F. App'x 7, 9 (4th Cir. 2005) (to state a claim under the Rehabilitation Act and Title II of the ADA, which prohibits discrimination by a "public entity," a learning-disabled student must show that he is "otherwise qualified").

[21] The College does not dispute that Hoppe has a learning disability. See ECF No. 14 at 15.

with "reasonable accommodation." *Id.* at 435. Courts, which are "particularly ill-equipped" to assess academic performance,[22] must "'defer[] to professional academic judgments when evaluating the reasonable accommodation requirement.'"[23] Higher education faculties "must have the widest range of discretion" in determining whether a student may be promoted. *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 n.11 (1985) (citation and internal quotation marks omitted).

The record shows that the College reasonably accommodated Hoppe during her exams.[24] Instead of the typical format of one day to complete six one-hour exams, the College allowed Hoppe to take four one-and-a-half-hour exams on October 14, 2006, and two one-and-a-half-hour exams the next day. Sister Slear Aff. ¶ 9; ECF No. 14, Ex. 9 at 1.[25] Although Hoppe asserts that she was

---

[22] *Davis v. Univ. of N.C.*, 263 F.3d 95, 102 (4th Cir. 2001) (citation and internal quotation marks omitted).

[23] *Betts*, 145 F. App'x at 13 (*quoting Kaltenberger*, 162 F.3d at 436).

[24] Hoppe does not challenge that she was reasonably accommodated during the Ph.D. Program's coursework phase; she received other students' notes, extra time on exams, and extended assignment deadlines. *See, e.g.*, ECF No. 14, Ex. 8 at 1.

[25] *See, e.g., Mershon*, 442 F.3d at 1077-78 (university reasonably accommodated disabled student under Title III of the ADA and the Rehabilitation Act by providing, *inter alia*, "extra time" to complete assignments); *cf. Betts*, 145 F. App'x at 9-10, 13-14 (university reasonably accommodated learning-disabled student under Title II of the ADA and the Rehabilitation Act by allowing extra time on exams).

13

not given a solitary environment on October 14, 2006 because Lawson was in the computer lab with her, see Compl. ¶¶ 4, 15, the record indicates that the College essentially provided such an environment. Hoppe does not dispute that: the computer lab was larger than a typical classroom, including the room where the other candidates were tested; a large chalkboard divided Hoppe and Lawson; Lawson sat with her back toward the chalkboard; and Lawson and Hoppe had no physical, verbal, or eye contact during the exams. Lawson Aff. ¶ 5; Sister Slear Aff. ¶ 9.

Although Hoppe asserts that Lawson made "noise" that impaired her ability to complete the October 14, 2006 exams, ECF No. 17 at 4--which Hoppe did not allege in her complaint--there is no indication in the record that Lawson made any distracting sound. To defeat a motion for summary judgment, the nonmovant must rely on more than "unsupported factual assertions." *Jurgensen v. Albin Marine, Inc.*, 214 F. Supp. 2d 504, 510 (D. Md. 2002). Hoppe does not dispute that she expressed appreciation to Sister Slear for the College's October 14, 2006 accommodations and chose to take four exams that day instead of three,[26] or that she raised the issue of Lawson's attendance in the computer lab for

---

[26] Sister Slear Aff. ¶ 10.

14

the first time in January 2007.[27] Further, Hoppe passed one October 14, 2006 exam that she took while Lawson was in the room. *See* Compl. ¶ 4.

After Hoppe's October 2006 exams, the College continued to provide reasonable accommodations in anticipation of her three retakes. Sister Slear discussed Hoppe's unsatisfactory answers with her, consulted Hoppe's professors, and offered feedback and review strategies. ECF No. 14, Ex. 11 at 1; *see also* ECF No. 14, Ex. 10 at 1. The College then offered two possible testing schedules so that Hoppe could retake the exams on her preferred Sundays; allowed her to take one exam every two weeks in a room by herself; and permitted her to complete the exams using an unprecedented open book format. Sister Slear Aff. ¶ 12; ECF No. 14, Ex. 12 at 1.[28] These accommodations conformed to the recommendations listed in Hoppe's post-exam, March 2008 psycho-educational evaluation.[29] Thus, the record reveals that Hoppe

---

[27] ECF No. 14, Ex. 11 at 1 (Dr. Ferguson's Jan. 25, 2007 letter noting her "surprise" that Hoppe had not complained about Lawson's presence until January 5, 2007).

[28] ECF No. 14, Ex. 14 at 1 (Ph.D. faculty committee's observation that the open book format an "extraordinary accommodation"); *see, e.g., Mershon*, 442 F.3d at 1077 (university reasonably accommodated learning-disabled student by, *inter alia*, providing an accommodation generally disallowed by school policy).

[29] ECF No. 14, Ex. 15 at 1, 8 (noting that if the Ph.D. Program were to readmit Hoppe, she should receive extra time on and breaks between exams, and a "quiet/solitary" testing environment).

was reasonably accommodated during her October 2006 exams and March and April 2007 retakes.[30]

Hoppe was dismissed from the Ph.D. Program only after her retakes were evaluated and graded by at least two faculty readers.[31] The Ph.D. faculty committee confirmed Hoppe's termination after "careful[ly]" reviewing the circumstances of her dismissal and the accommodations she had been afforded. ECF No. 14, Ex. 14 at 1. The record indicates that the dismissal decision was "made conscientiously and with careful deliberation," and is entitled to "great respect." *Ewing*, 474 U.S. at 225.

No reasonable jury could find that Hoppe was otherwise qualified to remain in the Ph.D. Program; despite the College's reasonable accommodations during her initial exams and retakes, Hoppe did not satisfy the Ph.D. Program's exam requirements.

---

[30] In *Kaltenberger*, a student with attention deficit-hyperactivity disorder was not reasonably accommodated during a course that she ultimately failed, but was accommodated when she retook it. 162 F.3d at 434-37. After the student failed a second time, the college dismissed her in accordance with its two-time fail rule even though she was not accommodated the first time. *Id.* at 435, 437. Noting its hesitation to intervene in academic judgments, the court "defer[red]" to the college's dismissal decision, "especially in light of the other accommodations which were made" to the student. *Id.* at 437. As discussed in this Part, Hoppe was reasonably accommodated during her initial exams *and* retakes.

[31] Sister Slear Aff. ¶ 13 (the faculty readers determined that Hoppe's answers lacked analysis, application, synthesis, and evaluation).

16

d. A Third Exam Opportunity

Although Hope asserts that the College should have given her a third opportunity to take the three October 14, 2006 exams, ECF No. 17 at 4, no reasonable jury could find that a third chance would not fundamentally alter the Ph.D. Program in light of the Two-Time Fail Rule.[32] The conferral of a degree places a school's "imprimatur" on the student as a qualified professional. *Kaltenberger*, 162 F.3d at 437 (deferring to college's refusal to waive its two-time fail rule). As the College notes, permitting a third try on the exams would require the institution to "fundamentally lower its standards and overall value of those candidates who earn [a] Ph.D." ECF No. 14 at 23. In determining whether the College provided reasonable accommodations, the Court "'must . . . give deference'" to the Two-Time Fail Rule. *Betts*, 145 F. App'x at 13 (*quoting Kaltenberger*, 162 F.3d at 436).[33]

---

[32] The College adopted the Two-Time Fail Rule after rejecting other institutions' harsher One-Time Fail Rule. Sister Slear Aff. ¶ 6.

[33] Hope also argues that because the College provided a solitary testing environment on October 15, 2006 and during her March and April 2007 retakes, providing such an environment on October 14, 2006 would not have "fundamentally altered" the nature of the Ph.D. Program. ECF No. 17 at 4-5. As discussed in this Part, the accommodation at issue is a third chance to take the exams, not providing a solitary testing environment. Also, as discussed in Part II.B.1.c, the record indicates that the College reasonably accommodated Hoppe on October 14, 2006, including providing an essentially solitary testing environment.

Accordingly, summary judgment must be granted to the College on Count One.

2. Count Two: Breach of Contract

Hoppe argues that the College "breached its agreement [and] violated its own policy" by failing to give her two chances to take the exams with reasonable accommodations. Compl. ¶ 16. Hoppe asserts that Dr. Ferguson's October 10, 2006 e-mail agreed to provide a solitary testing environment on October 14, 2006,[34] and Hoppe "continued to pursue her education and pay tuition" in "reliance on this agreement." ECF No. 17 at 6.

In moving for summary judgment, the College argues that it never entered into an enforceable contract with Hoppe. ECF No. 14 at 26; ECF No. 18 at 7.

Under Maryland law, an enforceable contract must be supported by consideration. *Chernick v. Chernick*, 327 Md. 470, 479, 610 A.2d 770, 774 (1992).[35] A promise becomes consideration for another promise if it creates a binding obligation. *Cheek*, 378 Md. at 148, 835 A.2d at 661. A promise to perform a pre-existing legal obligation does not constitute consideration. *See Dowling v. Bruffey*, 266 Md. 77, 81, 291 A.2d 471, 473 (1972).

---

[34] *See* ECF No. 14, Ex. 9 at 1 (Dr. Ferguson's Oct. 10, 2006 e-mail to Hoppe listing "accommodations for the written comprehensive exams," including "testing in a solitary environment").

[35] Consideration may be established by showing a detriment to the promisee or benefit to the promisor. *Cheek v. United Healthcare of Mid-Atl., Inc.*, 378 Md. 139, 148, 835 A.2d 656, 661 (2003).

18

Dr. Ferguson's October 10, 2006 e-mail reveals that it was provided in the context of meeting the College's pre-existing legal duty under the ADA and the Rehabilitation Act to reasonably accommodate Hoppe during her exams. ECF No. 14, Ex. 9 at 1 (Dr. Ferguson's e-mail listing Hoppe's upcoming "accommodations").[36] Further, if Hoppe is asserting that Dr. Ferguson's e-mail "promised to do more than [what] was required [by] law, the claim fails because of a lack of consideration." *Di Lella*, 570 F. Supp. 2d at 11. Although Hoppe asserts that she continued to pay tuition and pursue a Ph.D. based on the October 10, 2006 e-mail, she indisputably made her last tuition payment in May 2006 for her summer and fall 2006 classes. Franklin Aff. ¶¶ 3-5. Her last course began in September 2006. *Id.* ¶ 5. There is no indication that Dr. Ferguson's e-mail was supported by valid consideration, or that Hoppe relied on or changed her position because of the e-mail.

As explained in Part II.B.1.c, the record shows that the College provided Hoppe with two opportunities to take the exams with reasonable accommodations. These accommodations included

---

[36] *See, e.g., Di Lella v. Univ. of D.C. David A. Clarke Sch. of Law*, 570 F. Supp. 2d 1, 4-5, 11-12 (D.D.C. 2008) (dismissing learning-disabled student's breach of contract claim alleging that although her law school had promised in a letter to reasonably accommodate her during the semester, it had not; the claim "fail[ed] for lack of consideration" because the letter obligated the school to provide "nothing more than [it] was required to provide by [disability] law").

an essentially solitary environment during her four October 14, 2006 initial exams, and an undisputedly[37] solitary environment during her two remaining initial exams and three retakes. *See id.* The College's motion for summary judgment on Count Two will be granted.[38]

III. Conclusion

For the reasons stated above, the College's motion for summary judgment will be granted.

2/18/11
Date

William D. Quarles, Jr.
United States District Judge

---

[37] *See* ECF No. 17 at 4-5.

[38] Because the College's motion for summary judgment was addressed on the merits, the College's un-timeliness argument need not be reached. *See* ECF No. 14 at 26.